No. 34,119

FRANK ZEMAN and FRANCES ZEMAN, *Appellants,* v. THE FARMERS STATE BANK OF CUBA, STEVEN BENYSHEK, JOSEF NEKUDA and MRS. JOSEF NEKUDA, *Appellees.*

(88 P. 2d 1088)

Opinion filed April 8, 1939.

*N. J. Ward* and *Guy E. Ward,* both of Belleville, for the appellants.

*Frank G. Spurney, W. D. Vance, Fred Emery* and *P. L. Owsley,* all of Belleville, for the appellees.

The opinion of the court was delivered by

WEDELL, J.: This was an action to cancel and set aside various transactions which were component parts of the settlement of a controversy between the plaintiffs and the defendants, Josef Nekuda and his wife, and in which the defendant, Farmers State Bank of Cuba, participated through its cashier and managing officer, the defendant, Steven Benyshek. Damages were sought in the alternative. The defendants prevailed, and the plaintiffs appeal.

The trial court made the following findings of fact:

"1. Plaintiffs are husband and wife. Frank Zeman is about fifty-eight years of age, has lived in America more than fifty years, is a naturalized citizen, speaks Bohemian, and is also able to speak, read and write English. Mrs. Zeman and the defendants, Nekuda, speak, read and write Bohemian, but not English.

"2. Mr. and Mrs. Zeman are childless, with no near relatives in the United States, and have accumulated a moderate amount of property. Josef Nekuda is a nephew of Mrs. Zeman, one of the plaintiffs.

"3. Prior to 1935 the Nekudas lived in Czechoslovakia, and there was considerable correspondence between them and plaintiffs, the outcome of which was that the Nekudas came to the United States to work for plaintiffs. Plaintiffs promised the Nekudas that if they would come they would be accepted as their children, and after a time plaintiffs would give them a farm and move to town, and after they were through with their property the Nekudas would have it.

"4. Defendant Steven Benyshek is the cashier and managing officer of the Farmers State Bank of Cuba, of which bank plaintiffs were customers. Benyshek speaks, reads and writes both Bohemian and English.

"5. In October, 1935, the Zemans moved to a house they owned in Cuba from a farm on which they and the Nekudas had lived from the time of the Nekudas' arrival in the spring, the Zemans selling the Nekudas a number of items of personal property at the farm for $600, and taking a note therefor.

"6. Nekuda had been a miner in the old country and knew nothing of farming. There were occasional quarrels between Zeman and Nekuda, one of which went so far that Zeman, who angers rather easily, struck Nekuda with his fists.

"7. In January or February, 1937, Zeman became quite ill and was considerably worried over the situation existing between himself and the Nekudas, and desired to be freed of his obligations to them. At some time prior to this Zeman offered the Nekudas a sum of money if they would return to the old country, but such offer was never accepted.

"8. About January 30, 1937, plaintiffs wrote a letter to the Nekudas telling them to vacate the farm. The Nekudas consulted Frank Spurney, an attorney at Belleville, who wrote a letter asking that the Zemans come to his office to see if the difference might not be adjusted peaceably.

"9. At about the same time the defendant Benyshek was told by both the Zemans and Nekudas that there was difficulty between them. Zeman went so far as to say that the trouble was driving him crazy, and that he would have to give them a farm to be rid of them.

"10. The Zemans finally decided to settle their difficulties with the Nekudas by giving them a farm, and it was suggested by Benyshek that the Zemans buy a farm owned by the bank, said farm being described as the north half of the southwest quarter of 7-2-1 in Washington county, Kansas. Benyshek suggested that the Zemans look at the farm, but the Zemans said the farm would be satisfactory if it suited the Nekudas. A written contract was drawn up, by which Zeman was to pay $5,000 in cash and assume $2,500 of a mortgage for $7,000, which was secured on this eighty and an adjoining eighty. The deed from the bank to the Zemans recites the consideration to be $7,500,

subject to a mortgage of $2,500, and the deed from the Zemans to Nekuda conveys the property to him subject to that mortgage.

"11. Under date of February 9, 1937, the date of the contract of sale of the eighty by the bank to Zeman, a bill of sale was signed by Zeman in favor of Nekuda for farming implements, horses, cattle, chickens, household goods, etc., and reciting a consideration of $2,500 and also reciting cancellation of a $600 note held by Zeman dated November 1, 1935, by the Nekudas. The Zemans understood this $2,500 was to be secured on the farm they were buying for the Nekudas.

"12. Settlement between Zeman and the bank for the sale of the real estate was made by Zeman turning over to the bank $4,000 in notes and mortgages which he had at his home and a thousand-dollar waterworks bond which was in the bank, all of which were of the value of $5,000 at the time. Interest in the sum of $234.33 has been collected on these obligations by the bank to the time of trial.

"13. In the settlement between Zeman and the Nekudas a release was to be procured from the Nekudas. Benyshek undertook to procure this release and for that purpose went to Spurney's office in Belleville, where in the presence of the Nekudas and one Dick Bazant a release was drawn. This release was signed before Benyshek as notary on February 26, 1937. The Zemans understood this release was to relieve them of all claims against them on the part of Nekudas. Benyshek was not told by Zemans of the contents of the correspondence between them and the Nekudas and did not know what claims the Nekudas were making against the Zemans, except as it may have been disclosed in Spurney's office at the time the release was drawn. Benyshek had all the deeds, assignments and other papers in connection with the deal prepared, looked after the recording, and paid the revenue on the deeds.

"14. Dick Bazant was assisting in having the Nekudas accept the farm which the bank was selling to Zeman, and the court finds this to have been at the request of Benyshek, and not by request of Zeman.

"15. The court finds the reasonable market value of the eighty acres to have been $4,500 at the time the contract was entered into.

"16. The court finds that Frank Zeman was at all times mentally competent to transact business, but a part of the time was physically unable to leave his home, and that he left to Benyshek the matter of the Nekudas accepting the farm, getting the personal property reserved in the bill of sale he gave them and procuring the Nekudas' release.

"17. Plaintiffs had no independent advice in these matters, but were relying on Benyshek to carry out the transaction."

The conclusions of law were:

"1. As a matter of law the evidence was not sufficient to establish a fiduciary relationship between Benyshek and Zeman so far as the sale of the land by the bank to Zeman is concerned.

"2. The evidence is not sufficient to establish fraud on the part of Benyshek and the bank in the transactions involved in this action.

"3. Plaintiffs are released by the Nekudas of all claims for support on the part of the said Nekudas.

"4. It is not necessary to decide as to the validity of the other claims of the Nekudas to receive the plaintiffs' property after their death, and such question is not passed upon.

"5. Defendants should have judgment against plaintiffs for costs."

The grounds upon which plaintiffs had sought relief were: inability of the plaintiff, Frank Zeman, to read English and to understand the instruments involved; his physical and mental incompetency to transact business; a confidential relationship between plaintiffs and the defendant, Benyshek; fraud practiced by the defendant, Benyshek; failure of consideration for the settlement. In this court plaintiffs have abandoned all grounds for relief except the last three. Should the settlement have been set aside upon any of these grounds? It will be observed the conclusions of law were adverse to the plaintiffs. The plaintiffs concede the correctness of all findings made except, they contend, findings 10, 11, 13 and 17 should have been made more complete in compliance with their request. They also urge certain additional findings should have been made as requested and that their requested conclusions of law should have been adopted. The latter, if adopted, would have resulted in the cancellation of all instruments involved, restored the plaintiffs and the Nekudas to their respective positions prior to the settlement and in a judgment in favor of the plaintiffs, and against the defendant bank in the sum of $5,000.

A careful analysis of findings made discloses they in effect embrace some of the additional facts requested. The gist of the most important additional findings requested was that the defendant Benyshek knew, or should have known, that in the settlement the Zemans were requiring a release from the Nekudas of not only the promise of the Zemans to support the Nekudas during the lifetime of the Zemans, but also a release of the promise to leave their property to the Nekudas at their death, and that Benyshek undertook to obtain such a release for them. The trial court refused to make those findings. In that refusal plaintiffs contend the court erred. They direct our attention to the admission of the defendant, Benyshek, to the effect that he understood the Zemans desired to get entirely rid of the Nekudas and to the fact that he obtained a release only of the claims the Nekudas had against the Zemans for support during the lifetime of the latter. In this connection it again becomes necessary to restate a rule so frequently announced to the effect that on a review of findings made this court

is concerned only with evidence which supports findings and not with evidence which is contrary thereto. The same rule, of course, applies where a court refuses to make requested findings when there is substantial evidence directly contrary to, or inconsistent with, requested findings. The difficulty this court encounters with regard to the requested findings is that the testimony was the Zemans had informed Benyshek only of the fact that the Nekudas claimed they were entitled to support from the Zemans during the lifetime of the latter. Benyshek's testimony was also to the effect that so far as he knew he had obtained a complete release of any claim made by the Nekudas. If that testimony was believed by the court, and it apparently was, then, of course, the defendant bank and Benyshek were not guilty of fraud with respect to the obtaining of the release.

Plaintiffs further direct our attention to that portion of finding 13 which they say indicates the full claims of the Nekudas may have been disclosed at the time the release was drawn. That is not a finding such claims were disclosed. The testimony of the defendant, Josef Nekuda, as to what took place in that conference was exceedingly contradictory and the court probably placed little, if any, credence in that part of Nekuda's testimony. The testimony of Benyshek as to that conference was to the effect that if any claim other than for support was made at that time he did not remember it. In view of the record we are obliged to interpret finding 13, and conclusion of law No. 2, that in the opinion of the court, if there were disclosures at that conference of a claim other than for support, the evidence concerning such disclosures was not sufficiently clear and convincing to enable the court to say the disclosures were in fact made, and that Benyshek's conduct in the matter was fraudulent or breached any relationship which may have existed between him and the plaintiffs. Plaintiffs insist the court should have made a definite finding that Benyshek learned of such additional claim or that he did not. True, courts are required, when requested, to make specific findings upon material controverted issues of fact. (G. S. 1935, 60-2921.) We do not find, however, that this was the amendment plaintiffs requested as to finding 13, or any other finding. Moreover, it is not now contended that Zeman was unable to read or understand the instruments involved or that he was incompetent to transact the business in question. On the contrary, those facts are now conceded. Part of Benyshek's testimony disclosed Zeman came to the bank for the release, that they discussed the release and that he advised Zeman as follows:

". . . That in this release that he was giving him the north half of the southwest quarter of Sober's with a $2,500 mortgage on it to the company, and that by Nekuda signing this release they are releasing him of claims *for support and assistance.*" (Italics inserted.)

The defendant, Benyshek, further testified: "Zeman was satisfied and took the release and went out." Plaintiffs again remind us Benyshek testified to the effect he advised Zeman he was now entirely rid of the Nekudas. The trial court obviously did not interpret the statement as an attempt to deceive Zeman, but as a statement pertaining to all claims of the Nekudas for support during the lifetime of the Zemans. There was evidence to support that interpretation, as Benyshek admitted having made such statements, but contended they referred to the claim for support, which was the only claim as far as he knew.

The trial court further concluded the evidence was insufficient to establish a fiduciary relationship between Benyshek and Zeman as to the sale of the farm to Zeman. Plaintiffs remind us the court found the farm which Zeman purchased from the bank for the Nekudas was worth only $4,500, and that plaintiffs paid $7,500 therefor. They also contend they did not understand they were to pay $7,500 for the farm. There was abundant evidence plaintiffs knew the purchase price was $7,500 and that $5,000 was to be paid by them in cash and that a mortgage for the remaining $2,500 should be continued on the farm. They paid $5,000 in cash. There was ample evidence the Zemans understood they would convey the farm to the Nekudas, subject to the $2,500 mortgage, and that the mortgage debt would be payable to the loan company and not to them. The Nekudas at all times paid the interest on the mortgage to the loan company, and not to the plaintiffs. Zeman had made repeated visits to the bank to ascertain whether the loan company had agreed to that transaction. He was anxious to close the deal and to get the Nekudas off the home place. He does not now contend he was incompetent to transact that business or to read and understand the transaction involved. Clearly, he paid more for the farm than it was worth. At that particular time, however, he was not on speaking terms with the Nekudas and, in substance, informed Benyshek he did not care what kind of a farm it was so long as it satisfied the Nekudas and he got them off the home place. The latter result was accomplished. According to the undisputed testimony Benyshek advised him where the farm was located and invited him to look at it. Zeman knew ap-

proximately where the farm was located. In response to the invitation to inspect the farm, the uncontradicted testimony is that Zeman told Benyshek: "I am not buying it for myself, I am buying it for Nekuda. If he wants it, I will buy it for him." There was ample testimony from which the court could properly conclude that Zeman was not at that time particularly or primarily concerned about the actual value of the farm. It appears the bank took him at his word. The fact the Zemans later, and once more, reconciled their differences with the Nekudas and subsequently concluded they had made a perfectly foolish deal, does not establish the existence of a fiduciary relationship between the Zemans and Benyshek or the breach thereof, nor does it establish fraud.

There was another circumstance which unquestionably impressed the court. Plaintiffs were seeking rescission or damages against the bank in the alternative. The Zemans and Nekudas ostensibly had reconciled their differences and while this action was pending the Zemans made a secret warranty deed to the Nekudas in which they conveyed to them the home farm. Under the arrangement that deed, however, was not to be recorded unless plaintiffs won this lawsuit, and thereby deprived the Nekudas of the Washington county farm. The deed was made without the knowledge of plaintiffs' attorneys. Zeman also gave the implements, mentioned in the bill of sale which was part of the settlement agreement, to the Nekudas. In other words while plaintiffs were invoking the aid of a court of equity for the purpose of depriving the Nekudas of the property they had received in the settlement, plaintiffs by secret agreement arranged to protect the Nekudas in the event the court granted the relief against the Nekudas which plaintiffs sought in this action. Just what all the motives may have been for such a secret arrangement may be open to speculation. For present purposes it is sufficient to say the court could not well have refrained from considering that circumstance, together with all other facts, in determining the credence and weight it would give to any testimony against the defendant, Benyshek, or the defendant bank.

Plaintiffs urge the court should have found they were led by Benyshek to believe the $2,500 item for implements and other personalty on the farm was to be secured by a mortgage on the farm which Nekuda had received in the settlement. The evidence did not compel that finding.

Plaintiffs contend the settlement was without consideration to them as their action which resulted in the importation of aliens into this country to perform labor was void for the reason such action was prohibited by section 141, U. S. C. A., title 8. The contention the settlement lacked consideration is untenable for various reasons. It will be sufficient to note only a few of them. It is conceded the Nekudas were brought here to be accepted by the Zemans as their children. Moreover, the arrangements under which the Nekudas were admitted to the United States met the approval of our immigration authorities. (See, 2 Am. Jur., Aliens, §§ 85, 142, pp. 509, 538. For discussion of purposes of federal acts prohibiting the importation of foreign labor, see 2 Am. Jur., Aliens, § 86, p. 510.) Furthermore, there had been at least partial performance by each of the parties under the agreement to accept the Nekudas as their children, and under the allegations of plaintiffs' petition, and the unchallenged findings of fact, plaintiffs are in no position to urge failure of consideration for the settlement. In *Sawtelle v. Cosden Oil & Gas Co.*, 128 Kan. 220, 277 Pac. 45, it was said:

"It does not take a legal cinch to form a sufficient consideration for a settlement; a fairly debatable point is quite enough. (*Reed v. Kansas Postal Telegraph & Cable Co.*, 125 Kan. 603, 264 Pac. 1065.)" (p. 228.)

One other subject requires our attention. The court limited its judgment to a determination of the fact that by the release in question the Nekudas had released their claim against the Zemans for support during the lifetime of the latter. The judgment of the court further was that it was unnecessary, at this time, to decide the validity of the claim the Nekudas were entitled to receive the property of the Zemans at the death of the latter and that such question was not passed upon. We concur in that ruling and that question will be left open for later determination, if it becomes necessary.

This was essentially a fact case and by the findings made and on the findings the court refused to make, the issues were resolved against the plaintiffs. In view of the record we will not disturb the judgment.

The judgment is affirmed.